[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-11360

_____

D. C. Docket No. 04-00106-CV-HLM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 4, 2010
JOHN LEY
ACTING CLERK

JAMES RAY WARD,

Petitioner-Appellant,

versus

WARDEN HILTON HALL,
Georgia Diagnostic Prison,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 4, 2010)

Before EDMONDSON, BIRCH and BARKETT, Circuit Judges.

BIRCH, Circuit Judge:

Petitioner James Ray Ward, a Georgia death-row inmate, appeals the judgment of the United States District Court for the Northern District of Georgia denying his petition for the writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254. He raises issues challenging the validity of his convictions as well as his death sentence.[1] After careful consideration of the entire record, including oral argument, we AFFIRM Ward's convictions for murder, kidnaping with bodily injury, and feticide. As explained in Section IIE, however, we conclude that an improper bailiff-jury communication during the penalty phase violated Ward's constitutional right to a fair trial and a reliable sentence. We therefore REVERSE his death sentence and REMAND for a new sentencing phase hearing.

---

[1] Ward's claims, as formulated by the district court, include: (1) whether the district court erred in denying Ward's motion for an evidentiary hearing; (2) whether the district court erred in denying Ward's motion to expand the record; (3) whether the district court erred in denying Ward's claim in which he asserted that his counsel provided ineffective assistance by failing to investigate and present evidence of Ward's background and positive character traits in mitigation at sentencing; (4) whether the district court erred in denying Ward's claim in which he contended that his counsel provided ineffective assistance by failing to obtain competent, independent mental health expert assistance to prepare for trial and to present evidence; (5) whether the district court erred in determining that Ward's claim of juror/bailiff misconduct was procedurally defaulted and was not meritorious; (6) whether the district court erred in denying Ward's claim in which he asserted that his counsel provided ineffective assistance by failing to preserve the juror/bailiff misconduct claim by raising it on appeal; (7) whether the district court erred in denying Ward's claim that the state violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); and (8) whether the district court erred in denying Ward's claim that the unanimity instruction given by the trial court was unconstitutional.

# I.  BACKGROUND

In its order denying Ward's petition for a writ of habeas corpus, the district court reiterated the following findings of fact made by the Georgia Supreme Court in connection with Ward's direct appeal:

> The victim's husband left for work at 6:00 a.m. on August 17, 1989.  When he returned from work that evening, the 23-year-old victim, who was five months pregnant, was missing, along with her car.  Their 22-month-old daughter was at home by herself.
>
> When the police arrived later that evening, many friends and relatives were present.  At first, nothing appeared to be missing except for the victim and her car, but eventually it was learned that a telephone cord had been forcibly removed from the wall jack (leaving the plug), that most of the victim's underwear had been removed from her dresser drawer, and that a quilt and a baby blanket had been taken.
>
> The victim's car was discovered the next day on an unpaved logging road.  Her body was discovered the day after that in a trash dump several miles away.  Ligature marks around her wrists and ankles indicated she had been bound.  Three of her ribs were broken and there were various bruises about her body.  Her fetus was in a partially delivered condition.  The mother died of asphyxiation resulting from her pharynx being stuffed with wadded-up paper towels.  The death of the mother resulted in the destruction of the fetus.
>
> No clear suspects were developed for several months.  Then, early in the morning of December 18, 1989, the defendant, wearing gloves and a stocking mask, broke into a Gordon County home and kidnapped a woman [Donna Rich] from her bed as she lay sleeping with her nine-year-old daughter.  He drove the woman to an abandoned farmhouse, forced her to model negligees he had brought with him, and raped her.  Then he took her to another abandoned house and raped her again.  He told her that he had killed two people

and pointed out a "good place" to "dump bodies" if she ever wanted to. He also told her he had been watching her and told her some things about her personal situation that a stranger should not have known. He returned her to her home. Later, she discovered that some of her underwear was missing.

The Gordon County police arrested the defendant at his residence. The defendant's home was unfinished inside. Most of the walls were not sheetrocked and there was no running water and, except for the bedroom, no electricity. The unfinished rooms were full of boxes containing several thousands of dollars worth of lingerie and adult magazines. The defendant maintained notebooks carefully labelling (sic) and indexing magazines and lingerie catalogs (including descriptions and numerical ratings of women in the magazines). The officers found scraps of paper with physical descriptions of and tag numbers for women; dates, times and locations of observations; directions to their homes; newspaper clippings about rapes, murders and missing women; newspaper photographs of women; and driver's licenses and insurance cards belonging to various women.

In addition, officers found handwritten directions to the home of the victim in this case, her swimming suit bottom, her quilt and baby blanket, and – hidden under a pile of wood – six newspaper articles about her disappearance.

On January 18, 1990, the defendant admitted to police that he had visited the victim's home to check on a well he had helped drill earlier and had spoken to her. He said:

I don't know if I done anything to the girl or not. I could have done it. . . .
I been a liar all my life. I need some help. If I done it, I didn't mean for it to happen and I am sorry.

R4-77 at 48-52.

4

Ward was convicted by a jury in Walker County, Georgia, of feticide and the kidnaping and murder of Nikia Gilbreath and sentenced to death. Ward appealed his convictions and sentence to the Georgia Supreme Court. The Georgia Supreme Court affirmed Ward's convictions and sentence on 11 June 1992 and denied his motion for reconsideration on 2 July 1992. See Ward v. State, 417 S.E.2d 130 (Ga. 1992).

Ward then filed a petition for a writ of certiorari with the United States Supreme Court which was denied on 19 January 1993. See Ward v. Georgia, 506 U.S. 1085, 113 S. Ct. 1061 (1993). Ward's petition for a re-hearing was likewise denied by the Supreme Court on 8 March 1993. See Ward v. Georgia, 507 U.S. 980, 113 S. Ct. 1438 (1993).

On 19 April 1993, Ward filed a petition for a writ of habeas corpus ("state habeas petition") in the Superior Court of Butts County, Georgia.[2] The state habeas court conducted evidentiary hearings with respect to Ward's state habeas petition on 31 July 1997, 21 October 1997, 22 October 1997, and 22 December 1997. The court found that four of Ward's claims were procedurally defaulted because Ward failed to raise those claims on direct appeal and ultimately denied Ward's state habeas petition on 27 August 1998.

---

[2] Ward filed an amended petition in June 1995.

In response to Ward's application for a certificate of probable cause to appeal, the Georgia Supreme Court remanded Ward's state habeas petition to the Butts County Superior Court.[3]  After complying with the instructions of the Georgia Supreme Court, the state habeas court issued a second order making additional findings but again denying Ward's state habeas petition.

Ward filed a second application for a certificate of probable cause to appeal with the Georgia Supreme Court which was denied on 30 April 2003.  Ward then filed another petition for a writ of certiorari with the United States Supreme Court, which was again denied, as was his petition for re-hearing.

On 29 April 2004, Ward filed his 28 U.S.C. § 2254 petition ("federal habeas petition") in the district court.  He advanced thirty-six claims (as numbered in district court's order, see R4-77 at 23-39).  The district court then directed both Ward and the state to file briefs addressing procedurally defaulted claims and unexhausted claims.  After considering the briefs, the district court concluded that twenty-seven of Ward's claims were procedurally barred – four claims were procedurally defaulted because Ward failed to raise them on direct appeal and

---

[3] The Georgia Supreme Court directed further review of the reasonableness of counsels' conduct regarding scientific testing of apparent blood stains found on Ms. Gilbreath's quilt, and permitted additional questioning of trial counsel, testing of blood, and further evidentiary development concerning the bloodstain issue.  The state habeas court was also required to clarify the portion of its order that rejected Ward's claim that the bailiffs in his case had not been sworn.

twenty-three were determined to be unexhausted and so procedurally barred. Ward filed a motion for reconsideration, which was denied on 6 October 2005.

On 14 October 2005, Ward filed a motion for leave to conduct discovery. The district court denied the motion on 19 December 2005. On 3 May 2006, Ward filed a motion for an evidentiary hearing. The district court denied that motion on 2 June 2006.

After considering Ward's memorandum in support of his petition for a writ of habeas corpus, the state's brief in opposition, and Ward's reply brief, the district court denied Ward's petition on 6 February 2007. Ward filed a motion to alter or amend, which the district court also denied. The district court then granted Ward's motion for a certificate of appealability on eleven claims, eight of which are before us in this case.[4]

## II. DISCUSSION

"We review <u>de novo</u> a district court's grant or denial of a habeas corpus petition. The district court's factual findings are reviewed for clear error, while mixed questions of law and fact are reviewed <u>de novo</u>. An ineffective assistance of

---

[4] The three issues included in the district court's certificate of appealability but not raised by Ward include: (1) Ward's claim that his counsel provided ineffective assistance by failing to challenge biased jurors; (2) his contention that the state made several improper and prejudicial arguments; and (3) the district court's denial of his motion for discovery.

7

counsel claim is a mixed question of law and fact subject to de novo review."

McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005) (citations omitted).

Because Ward filed his federal habeas petition after 24 April 1996, this case is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA precludes federal courts from granting habeas relief on claims that were previously adjudicated in state court unless the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As explained by the Supreme Court, the phrase "'clearly established Federal law' . . . refers to the holdings . . . of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). We have held that to be "contrary to" clearly established federal law, the state court must either (1) apply a rule "that contradicts the governing law set forth by Supreme Court case law," or (2) reach a different result from the Supreme Court "when faced with materially indistinguishable facts." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2003).

As regards the "unreasonable application" prong of § 2254(d)(1), we have held as follows:

> A state court decision is an unreasonable application of clearly established law if the state court unreasonably extends or fails to extend a clearly established legal principle to a new context. An application of federal law cannot be considered unreasonable merely because it is, in our judgment, incorrect or erroneous; a state court decision must also be unreasonable. Questions of law and mixed questions of law and fact are reviewed de novo, as is the district court's conclusion regarding the reasonableness of the state court's application of federal law.

Jennings v. McDonough, 490 F.3d 1230, 1236 (11th Cir. 2007) (quotation marks and citations omitted). In sum, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409, 120 S. Ct. at 1521. Finally, 28 U.S.C. § 2254(e)(1) commands that for a writ to issue because the state court made an "unreasonable determination of the facts," the petitioner must rebut "the presumption of correctness [of a state court's factual findings] by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A critical prerequisite for any state petitioner seeking federal habeas relief is the requirement that he first properly raise the federal constitutional claim in the state courts. See id. § 2254(b). The exhaustion requirement springs from principles of comity, which protect the state court's role in the enforcement of

9

federal law and prevent disruption of state court proceedings.  See Rose v. Lundy,

455 U.S. 509, 518, 102 S. Ct. 1198, 1203 (1982).  The statute provides that:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>> (B)(i) there is an absence of available State corrective process; or
>>> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
> (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

28 U.S.C. § 2254(b).  Thus, in order to exhaust state remedies, a petitioner must

fairly present every issue raised in his federal petition to the state's highest court,

either on direct appeal or on collateral review.  See Castille v. Peoples, 489 U.S.

346, 351, 109 S. Ct. 1056, 1060 (1989) (quotation marks and citation omitted).  In

addition, the state court petition must make the state courts aware that the claims

asserted do, in fact, raise federal constitutional issues.  See Snowden v. Singletary,

135 F.3d 732, 735 (11th Cir. 1998).  If a petitioner fails to exhaust state remedies,

the district court should dismiss the petition without prejudice to allow exhaustion. See Rose, 455 U.S. at 519-20, 102 S. Ct. at 1203-04.

"The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001). The doctrine of procedural default dictates that "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). However, a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. Marek v. Singletary, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).

We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." Judd, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim."[5] Id.

---

[5] We qualify Judd's first prong with the following observation from the Supreme Court:

> The problem we face arises, of course, because many formulary orders are not meant to convey anything as to the reason for the decision. Attributing a reason is therefore both difficult and artificial. We think that the attribution necessary for federal habeas purposes can be facilitated, and sound results more often assured, by applying the following presumption: Where there has been one reasoned state

11

Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. See id. Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." Id.

A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation. See Wainwright v. Sykes, 433 U.S. 72, 84-85, 97 S. Ct. 2497, 2505 (1977). To show cause, the petitioner must demonstrate "some objective factor external to the defense" that impeded his effort to raise the claim properly in state court. Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986). A showing that the legal basis for a claim was not "reasonably available to counsel" could constitute cause. Reed v. Ross, 468 U.S. 1, 16, 104 S. Ct. 2901, 2910 (1984). We have also determined that an ineffective-assistance-of-counsel claim, if both exhausted and not procedurally defaulted, may constitute

---

judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion "fairly appears to rest primarily upon federal law, we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991) (quotation marks, citations and alterations omitted).

12

cause. See Hill v. Jones, 81 F.3d 1015, 1031 (11th Cir. 1996). As stated by the Supreme Court, "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." Edwards v. Carpenter, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000).

It is well established that if the petitioner fails to show cause, we need not proceed to the issue of prejudice. See McCleskey v. Zant, 499 U.S. 467, 502, 111 S. Ct. 1454, 1474 (1991). Once cause is established, however, the petitioner also must show actual prejudice from the alleged constitutional violation. See Sykes, 433 U.S. at 84, 97 S. Ct. at 2505. We have held that in order to show prejudice, a petitioner must demonstrate that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." McCoy v. Newsome, 953 F.2d 1252, 1261 (11th Cir. 1992) (per curiam).

Finally, if a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception

13

is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence.  <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

Having established the legal framework governing Ward's habeas petition, we address each of his arguments in turn.

## A.  <u>Ward's Motion for an Evidentiary Hearing</u>

Ward contends that the district court erred in denying his motion for an evidentiary hearing.[6]  Ward argues that an evidentiary hearing was necessary for him to present evidence in support of his claim of ineffective assistance of counsel during the sentencing phase of his trial.  He asserts that he was unable to develop those claims fully in the state habeas court proceedings through no fault of his own but rather due to the budget and staffing problems of the Georgia Appellate Practice and Educational Resource Center ("Georgia Resource Center").[7]  Ward maintains that 28 U.S.C. § 2254(e)(2) does not apply to him because he was reasonably diligent in his attempt to develop the record in state court. He submits that the Georgia courts' refusal to fund investigative efforts "cannot translate into a failure to develop" on his part.  R2-48 at 12.

---

[6] We note that Ward's argument on appeal mirrors his argument before the district court on this issue.

[7] The Georgia Resource Center was established by the Georgia Supreme Court in 1988 in order to recruit volunteer counsel for Georgia capital post-conviction cases.

Specifically, Ward seeks an evidentiary hearing in order to present evidence that his trial counsel provided ineffective assistance by failing to present sufficient mitigating evidence during the sentencing phase of his trial, and by failing to obtain competent, independent mental health expert assistance to prepare for trial and to present evidence. Ward contends that numerous witnesses were available to testify about his troubled childhood, the allegedly harsh conditions imposed by his adoptive parents, his poor school performance, and his good character as an adult. In addition, Ward argues that his trial counsel failed to secure and submit affidavits from members of the community who would have asked the jury to spare his life.

Under 28 U.S.C. § 2254(e)(2), as amended by the AEDPA, a federal court shall not hold an evidentiary hearing on a claim if the petitioner has failed to develop the factual basis for the claim in state court unless the petitioner shows that

> (A) the claim relies on –
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

15

28 U.S.C. § 2254(e)(2). If the petitioner was not diligent in his efforts to develop his claim in state court, he may not receive an evidentiary hearing unless he can satisfy the provisions of § 2254(e)(2)(A) and (B). See Williams v. Taylor, 529 U.S. 420, 437, 120 S. Ct. 1479, 1491 (2000).

> As regards the diligence requirement, the Supreme Court instructs us that
>
> [f]or state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings. Yet comity is not served by saying a prisoner has failed to develop the factual basis of a claim where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2).

Id. (quotation marks omitted). In light of this guidance, the question of whether a petitioner must satisfy § 2254(e)(2)'s requirements turns on whether the petitioner or his counsel were diligent in developing the record in the state habeas proceedings. If so, a federal court may grant an evidentiary hearing without further regard for the provisions of § 2254(e)(2). If not, § 2254(e)(2)'s requirements must be met. We review a district court's decision to grant or deny an evidentiary hearing for abuse of discretion, see McNair, 416 F.3d at 1297, and note that a

determination of diligence is a finding of fact which we will not disturb unless it is clearly erroneous. See Hall v. Head, 310 F.3d 683, 697 (11th Cir. 2002).

On 2 June 2006, the district court denied Ward's motion for an evidentiary hearing. The district court concluded that Ward was not diligent in developing the facts underlying his claims of ineffective assistance of counsel (for failure to investigate adequately and present mitigating evidence during sentencing and for failure to obtain competent, independent mental health expert assistance to prepare for trial and to present evidence) in the state habeas proceedings. The district court presented four reasons for its decision.

First, the district court looked to our decisions in McNair and Isaacs v. Head, 300 F.3d 1232 (11th Cir. 2002). The district court relied upon our finding in McNair that the district court in that case abused its discretion in granting an evidentiary hearing because, inter alia, the petitioner had failed to present any evidence before the state habeas court in support of his ineffective assistance of counsel claim, even though he had ample opportunity to do so. See McNair, 416 F.3d at 1299. The district court also cited our determination in Isaacs that the petitioner was not entitled to an evidentiary hearing before the federal habeas court because he failed to develop the factual predicate underlying his claim when

17

presented with an opportunity to do so before the state habeas court. See Isaacs, 300 F.3d at 1249-50.

Second, the district court reiterated the rule that a petitioner must raise claims of which he or his counsel are aware in the state habeas proceedings. Third, the district court cited two Fifth Circuit opinions in support of its determination that Ward should have obtained and presented the affidavits and testimony at issue in the state habeas proceedings and that any argument about lack of funding is without merit because "'[o]btaining affidavits from family members is not cost prohibitive.'" R2-53 at 22 (quoting Dowthitt v. Johnson, 230 F.3d 733, 758 (5th Cir. 2000)); see also Roberts v. Dretke, 356 F.3d 632, 641 (5th Cir. 2004) ("Seeking and presenting medical records and affidavits from family members available at the time of the state habeas hearing is within the exercise of due diligence."). Finally, the district court referenced another district court case for the proposition that a

> [p]etitioner's complaint about limited funding for investigative expenses incurred during his state habeas corpus proceeding does not excuse the failure of petitioner's state habeas counsel to contact petitioner's family members and others possessing personal knowledge of the matters central to petitioner's unexhausted claims herein. The failure to present the state habeas court with either specific factual allegations or affidavits from petitioner and petitioner's family supporting petitioner's unexhausted claims herein was not of due diligence.

Gutierrez v. Dretke, 392 F. Supp. 2d 802, 891 (W.D. Tex. 2005).

In short, the district court concluded that because Ward failed to present the evidence (testimony and affidavits from family and friends) at his state habeas proceeding that he now seeks to introduce via an evidentiary hearing at his federal habeas proceeding, his protestation of diligence fell short of the mark. The district court noted that Ward did manage to present some evidence underlying his claims to the state habeas court – a fact that signaled to the district court that Ward's state habeas counsel "indeed had sufficient funding and time to do at least some investigation and evidence gathering, but that counsel simply chose not to pursue the affidavits that [Ward] now seeks to present." R2-53 at 24. After finding that Ward was not sufficiently diligent at the state habeas proceedings, the district court also determined that he did not meet the more stringent requirements of § 2254(e)(2)(A) and (B).

Based on our review of the record, we conclude that the district court's finding that Ward was not diligent was not clearly erroneous and its denial of Ward's motion for an evidentiary hearing was not an abuse of discretion. First, we consider the time line involved. Ward filed his state habeas petition on 19 April 1993. On 21 November 1994, the Georgia Resource Center assumed responsibility for Ward's case. The superior court set a tentative date for an evidentiary hearing

19

for June or July 1995, providing Ward with at least seven months to secure affidavits and other witness testimony. The evidentiary hearing was then rescheduled for 21-22 November 1995.[8] It was then delayed again until 29-30 May 1997, and then again until 31 July 1997. At that point, Ward had had over two years to prepare for the evidentiary hearing before the state habeas court. In addition, two more evidentiary hearings were held, one from 21-22 October 1997 and another on 22 December 1997. Over the course of the four days of evidentiary hearings, Ward ultimately tendered thirty-seven exhibits, including twelve affidavits and one deposition.

Given the fact that Ward was afforded approximately three years to secure affidavits and witness testimony prior to his state habeas evidentiary hearings and managed to submit numerous exhibits and affidavits during the course of his hearings, including affidavit testimony from family members, friends, acquaintances, and former jurors, we cannot credit his claim that he exercised due diligence. Indeed, the record compels the contrary conclusion that Ward, as the district court correctly found, "simply chose not to pursue the affidavits [then] that [he] now seeks to present." R2-53 at 24. Moreover, Ward presents no evidence suggesting that the material that he now seeks to present was not available during

---

[8] During this time period (November - December 1995), Mr. Stephen Bayliss ("Bayliss") became counsel of record for Ward.

20

the period between the submission of his state habeas petition and his state habeas evidentiary hearings, nor has he offered any legal authority in support of his claim that limited funding somehow excuses his or his state habeas counsel's failure to contact additional potential witnesses or to gather additional evidence. Accordingly, we conclude that Ward was not diligent. As such, he is subject to § 2254(e)(2)(A) and (B)'s more exacting standard. See Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc) ("That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.").

As we already have indicated, we also agree with the district court's findings regarding Ward's failure to satisfy the requirements of § 2254(e)(2)(A) and (B). Ward's argument hinges on the threshold question of his diligence in developing the record underlying his claims in the state habeas proceedings. He presents no alternative argument should we find, as we have, that he is subject to § 2254(e)(2)(A) and (B). We note that Ward seeks to submit material via a federal habeas evidentiary hearing in support of both a claim relating to his sentence (i.e., Ward's contention that his trial counsel provided ineffective assistance in failing to

investigate adequately and present mitigating evidence at the sentencing phase of his trial) and a claim arguably relating to both the guilt and innocence phase and the sentencing phase of his trial (i.e., Ward's claim that his trial counsel provided ineffective assistance by failing to obtain competent, independent mental health expert assistance to prepare for trial). First, we previously have determined that the § 2254(e)(2)(A) and (B) exceptions do not apply to issues relating to the sentencing phase of a trial. See In re Jones, 137 F.3d 1271, 1274 (11th Cir. 1998) (per curiam) ("As [we have] noted, and the statute itself specifies, this exception applies only to claims going to the question of whether or not the applicant is 'guilty of the underlying offense' – not to claims related to sentence."). Second, Ward has not established that his ineffective-assistance-of-counsel claim regarding the failure to obtain independent mental health expert assistance meets any of the exceptions enumerated in § 2254(e)(2)(A) and (B). Accordingly, we conclude that the district court did not abuse its discretion in denying Ward an evidentiary hearing.

B. Ward's Motion to Expand the Record

Ward argues that the district court erred in denying his 23 October 2006 motion to expand the record pursuant to Rule 7(a) of the Rules Governing Section

2254 Cases ("Rule 7").[9]  In his motion to the district court, Ward sought the introduction of the same affidavits that he submitted with his previous motion for an evidentiary hearing.  The district court denied the motion, stating that its "[c]onsider[ation] [of] the affidavits in connection with the merits of [Ward's] § 2254 Petition would, in effect, allow [Ward] to do an end-run around the Court's decision denying [Ward] an evidentiary hearing."  R3-68 at 4-5.  On appeal, Ward challenges the district court's reference to § 2254(e)(2), arguing that because § 2254(e)(2) concerns requests for evidentiary hearings, it was error for the district court to look to that provision in ruling on Ward's motion to expand the record.

We review a district court's denial of a Rule 7 motion to expand the record for abuse of discretion.  See Haliburton v. Sec'y for the Dep't of Corr., 342 F.3d 1233, 1242 (11th Cir. 2003); see also Ford v. Seabold, 841 F.2d 677, 691 (6th Cir.

---

[9] Rule 7 of the Rules Governing Section 2254 Cases ("Rule 7") provides:

(a) In general.  If the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition.  The judge may require that these materials be authenticated.

(b) Types of materials.  The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge.  Affidavits may also be submitted and considered as part of the record.

(c) Review by the opposing party.  The judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness.

28 U.S.C. § 2254 Rule 7.

1988). Although we have not yet addressed the interplay between § 2254(e)(2) and Rule 7, the Supreme Court and two of our sister circuits have. In Holland v. Jackson, 542 U.S. 649, 652-53, 124 S. Ct. 2736, 2738 (2004), the Court determined that

> [u]nder the habeas statute, [the witness's] statement could have been the subject of an evidentiary hearing by the District Court, but only if respondent was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met. Those same restrictions apply a fortiori when a prisoner seeks relief based on new evidence without an evidentiary hearing.

Id. (citations omitted). The Seventh Circuit formulated its rationale as follows:

> The ability of a habeas petitioner to introduce new evidence into the record depends on the interplay between two provisions: 28 U.S.C. § 2254(e)(2) and Habeas Corpus Rule 7. Section 2254(e)(2) addresses the requirements to obtain an evidentiary hearing. It provides: "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows . . . a factual predicate that could not have been previously discovered through the exercise of due diligence." Habeas Rule 7 preceded the enactment of this provision and speaks to when a district court may expand the record. It provides that the district 'judge may direct that the record be expanded by the parties by the inclusion of additional materials relevant to the determination of the merits of the petition.'
> . . . .
> . . . When expansion of the record is used to achieve the same end as an evidentiary hearing, the petitioner ought to be subject to the same constraints that would be imposed if he had sought an evidentiary hearing. . . . Thus, to introduce . . . new affidavits, [the petitioner] must satisfy the standards of § 2254(e)(2).

24

Owens v. Frank, 394 F.3d 490, 498-99 (7th Cir. 2005) (quotation marks and citations omitted).  Likewise, the Ninth Circuit concisely summed up its holding on this matter by stating that

> [t]he Supreme Court recently made clear in Holland v. Jackson, that the conditions of § 2254(e)(2) generally apply to Petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing.  An exception to this general rule exists if a Petitioner exercised diligence in his efforts to develop the factual basis of his claims in state court proceedings.  We hold that this exception does not apply because . . . Petitioner did not exercise the required diligence.  Thus, under Holland, he must comply with § 2254(e)(2) in order to expand the record under Rule 7.

Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (citations omitted).

In light of the Supreme Court's guidance in Holland and our sister circuits' considered positions on the issue, and given our previous conclusion concerning Ward's lack of diligence, we conclude that Ward must comply with § 2254(e)(2) in order to expand the record under Rule 7.  Because we find that he cannot meet that burden, we conclude that the district court did not err in denying Ward's motion to expand the record.

C.  Ineffective Assistance of Counsel for Failure to Investigate Mitigating Factors for the Sentencing Phase

Ward argues that his trial counsel, Christopher Townley ("Townley")[10], failed to conduct an adequate background investigation before deciding on a strategy for the sentencing phase of his trial. He claims that although a private investigator was hired for the case, his duties extended solely to the merits phase of the trial and that the task of developing background information for sentencing was delegated to Townley's legal assistant, Deana Jones ("Jones"). Ward challenges Townley's testimony at the state habeas proceeding that he gained sufficient information about Ward's background by speaking with some of Ward's family members and by having others interviewed by staff members. Ward contends that Townley's efforts to interview Ward's family, friends, former teachers, and employers were not sufficient to enable him to make a reasoned tactical decision about the sentencing phase defense. Moreover, Ward argues that because Townley knew that Ward's childhood was particularly traumatic, he should have sought out additional information about Ward's early life.

We have held that the petitioner bears the heavy burden of proving his ineffective-assistance-of-counsel claim by a preponderance of the evidence. Putman, 268 F.3d at 1243. That said, we also note that a petitioner need not

___

[10] Although David Dunn also represented Ward at his trial, Ward contends that Townley "alone called the shots regarding the penalty phase" of the trial. Appellant's Initial Brief at 21 n.10.

present testimonial evidence but a federal court may make a fair determination of the claim simply by reviewing the trial transcripts. See Eagle v. Linahan, 279 F.3d 926, 938 (11th Cir. 2001).

Strickland v. Washington instructs us that the benchmark for judging a claim of ineffective assistance of counsel is whether counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984). In order to prevail on an ineffective-assistance-of-counsel claim, a petitioner must establish two things. First, he must prove that counsel's performance was deficient. "Second, the [petitioner] must show that the deficient performance prejudiced the defense." Id. at 687, 104 S. Ct. at 2064. We echo the caution sounded by the Court in Strickland: "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." Id. at 693, 104 S. Ct. at 2067. We also note the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other. Indeed, we previously have concluded that because both parts of the test must be satisfied to show a Sixth Amendment violation, a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa. See Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000).

27

In order to prove the deficient performance prong of the Strickland test, the petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. "Judicial scrutiny of counsel's performance must be highly deferential" and there is a "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." Id. at 689, 104 S. Ct. at 2065. Indeed, as we have said, "[t]he test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead, the test is . . . whether what [counsel] did was within the wide range of reasonable professional assistance." Waters, 46 F.3d at 1518 (quotation marks and citation omitted). In order to establish that counsel's conduct was unreasonable, therefore, the petitioner must prove "that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). Restated, "[t]he test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Waters, 46 F.3d at 1512 (quotation marks and citation omitted).

28

Another important facet of most ineffective-assistance-of-counsel claims is trial strategy. We have long held that the fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel. See Chandler, 218 F.3d at 1314. Moreover, "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy." Id. (quotation marks and citation omitted). We stated the following regarding trial strategy and its relationship to ineffective-assistance-of-counsel claims:

> By "strategy," we mean no more than this concept: trial counsel's course of conduct, that was neither directly prohibited by law nor directly required by law, for obtaining a favorable result for his client. For example, calling some witnesses and not others is "the epitome of a strategic decision." [Waters, 46 F.3d] at 1512 (en banc); see also id. at 1518-19 (en banc); Felker v. Thomas, 52 F.3d 907, 912 (11th Cir. 1995) (whether to pursue residual doubt or another defense is strategy left to counsel, which court must not second-guess); Stanley v. Zant, 697 F.2d 955, 964 (11th Cir. 1983) (stating that reliance on line of defense to exclusion of others is matter of strategy).

Chandler, 218 F.3d at 1314 n.14. The Strickland Court also has discussed trial strategy in the context of ineffective-assistance-of-counsel claims and underscores the importance of counsel's decision whether to conduct investigations as part of that strategy. As stated by the Court:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066. The Court also addressed the duty to adequately investigate mitigating evidence in Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003).

Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. . . . [S]trategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation.

Id. at 533, 123 S. Ct. at 2541 (quotation marks and citation omitted).

If the petitioner is successful in proving deficient performance by counsel, he must then establish prejudice before he is entitled to relief. To prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068. Moreover,

30

> [t]he governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

Id. at 695, 104 S. Ct. at 2068-69. Finally, in making the prejudice determination, the court must consider the totality of the evidence before the judge or jury in question. See id. at 695, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696, 104 S. Ct. at 2069.

Ward first raised the ineffective-assistance-of-counsel claim at issue in his state habeas petition. In his first state habeas petition, Ward claimed that "[c]ounsel failed to conduct an adequate pretrial investigation into Petitioner's life and background to uncover and present to the jury evidence in mitigation . . . [and] [a]s a result, the jury failed to hear compelling evidence in mitigation of sentence." R1-6, Exh. 51 at 5. Ward reiterated his claim in his first amended state habeas petition. After evidentiary hearings held by the state habeas court, Ward filed a post-hearing brief in support of his state habeas petition.

31

In his post-hearing brief, Ward contended that Townley's initial strategy for the sentencing phase of the trial was to present evidence of Ward's deprived childhood through the testimony of his biological mother, Cora Jones. Ward claimed that during his sentencing phase opening argument, Townley primed the jury to expect to be presented with evidence of Ward's childhood but then failed to present any such evidence, even though it was readily available. Ward further claimed that Townley made only minimal efforts to contact Cora Jones and secure her presence at trial and that even those minimal efforts were subcontracted to his legal assistant.[11] In addition, Ward noted that Townley failed to produce several other family members and acquaintances, all of whom would have had positive things to say about Ward during the sentencing phase of his trial. These individuals included Elyse Stockton (Ward's adoptive niece), Sammy Wyatt (Ward's co-worker), and Fred Dukes (Ward's supervisor).

The state habeas court denied Ward's state habeas petition on 27 August 1998. Before discussing the merits of Ward's various ineffective-assistance-of-counsel claims, the state habeas court commented on the relative experience and depth of knowledge in death penalty litigation possessed by each of Ward's trial

---

[11] Although Cora Jones had been subpoenaed, Ward also cites Townley's failure to request a continuance in order to search for Jones and his failure to utilize the Walker County Sheriff's Department to bring Jones to trial.

attorneys (Townley and Dunn). "At the time of [Ward's] trial, attorney Townley had previously been involved in the prosecution of at least three death penalty cases, and had conducted the defense in a death penalty case that ultimately resulted in a guilty plea. Attorney Dunn had been the lead prosecutor on two death penalty cases and assisted on two others." R1-6, Exh. 70 at 7 (citation omitted).

The state habeas court then addressed Ward's claim that his trial counsel "failed to effectively investigate and present evidence regarding his childhood and his positive character traits." Id. at 9. The court made the following findings:

> Although defense counsel decided not to present evidence regarding [Ward's] childhood, their investigation into the issue was certainly reasonable. Information was obtained from [Ward's] biological mother, but she ultimately refused to testify on her son's behalf. Defense counsel talked to [Ward's] siblings, but decided not to use their testimony because they had come from the same environment and, unlike [Ward], had 'apparently done pretty well for themselves.' In addition to talking to family members, defense counsel obtained [Ward's] school, medical, and psychological records. [Ward] has failed to show that defense counsels' investigation or strategic decision not to present evidence on this issue was deficient.

Id. at 9-10 (citations omitted). The next court to address the issue was the district court in its denial of Ward's federal habeas petition.

The district court ultimately concluded that the state habeas court's decision with respect to the ineffective-assistance-of-counsel claim at issue was not contrary to, or an unreasonable application of, clearly established federal law, and that this

33

determination was not based on an unreasonable application of the facts. The district court noted that Ward's trial attorneys obtained information about Ward's background from Ward himself (via Ward's autobiography), from conversations with Ward's family members, his elementary school teacher and with a minister familiar with Ward. In addition, Ward's attorneys investigated Ward's past psychological history, prison history, and school background, successfully obtained Ward's school and chiropractic records, and attempted to obtain Ward's birth certificate and psychological records.

The district court found that Ward's trial counsel made a reasonable, strategic decision not to introduce mitigating evidence concerning Ward's background and early years. The court pointed to Townley's testimony regarding the penalty phase of Ward's trial in support of its finding:

> A [Townley]: We wanted to try to put together the best presentation that we could to try to convince a very conservative jury not to give him the chair. The Walker County juries historically are sort of notorious about not wanting to hear, Gee, poor me, unless you couple it with remorse. We didn't have remorse. And as a result, we felt like it was stronger to go in other directions for the death penalty, to try to prevent it.
>
> Q: Can you elaborate what you mean by the, Gee, poor me, what all that type of defense entails?
>
> A: When I use that term what I'm referring to is you put in a lot of evidence concerning the defendant's background showing what got him to that point, that there were things beyond his control and his

34

early years, usually, that put him in the position to be doing the events that he is convicted of. And I think sometimes that can be a very effective, very effective argument because there is a lot of truth in it.

R4-77 at 79-80. The district court also highlighted the fact that Ward's trial counsel took into account the individual jurors selected when devising a trial strategy and further noted that Townley's decision to not present evidence concerning Ward's troubled childhood was reasonable in light of Ward's age (thirty-three) at the time that the crime was committed.

The district court then entertained Ward's specific complaints regarding Townley's failure to present the testimony of Ward's biological mother, his failure to investigate adequately Ward's adoptive parents and the manner in which they raised Ward, and his failure to investigate and pursue evidence concerning Ward's positive character traits. With regard to Townley's alleged failure to present any testimony from Ward's biological mother, Cora Jones, the district court noted Ms. Jones indicated that she did not wish to testify at Ward's trial, refused to answer telephone calls to her residence by members of the defense team, and otherwise actively evaded efforts by the defense team to contact her during the sentencing phase of Ward's trial. In light of this recalcitrant behavior, Townley made a reasoned decision to forego Ms. Jones's testimony for fear that she might prove hostile on the stand and do more harm than good for the case.

35

With regard to Ward's contention that Townley failed to conduct a reasonable investigation concerning his adoptive parents and the environment in which he was raised, the district court noted that Townley did query Ward about his adoptive parents and also learned much about Ward's upbringing through Ward's autobiography. After considering the information available, Townley concluded that although Ward's adoptive parents were perhaps too strict, Ward "basically had good feelings" towards them. Id. at 85. Consequently, Townley decided against introducing evidence concerning Ward's strict upbringing. The district court recited Townley's rationale as follows:

> One of the things that I was concerned about if I went too far down that road was that [Ward] had had a bad environment, but he had a brother who had had a bad environment, he had a sister who had had a bad environment. They had apparently done pretty well for themselves. The brother's feelings were that he didn't believe [Ward] did it, but if [Ward] did it, that he came from the same background, and somebody who would do that should get the chair. The State was aware of that. He had apparently spent a long time talking with Johnny Bass, who was the State's investigator, and I was concerned about some of how that evidence would come across.

Id.

Finally, the district court addressed Ward's claim that Townley should have pursued other evidence in mitigation, including evidence concerning his positive character traits or his childhood surgeries and illnesses. First, the district court noted that Townley actually did secure and review Ward's school records, but

36

ultimately decided not to use them in the sentencing phase of the trial. Then the court emphasized the fact that Townley's professed strategy during the penalty phase of the trial was to focus on the non-intentional nature of Ms. Gilbreath's death and residual doubt. Given that decision, the district court found that Townley's alleged failure to pursue additional mitigation evidence was not objectively unreasonable.

The district court also concluded that Ward could not satisfy the prejudice prong of the Strickland test. First, the evidence incriminating Ward, although circumstantial, was strong. Second, the court reflected on the additional damning evidence presented to the jury: the fact that the victim was four months pregnant at the time of her murder; the fact that Ward had been convicted of abducting and raping another woman; the fact that Ward had allegedly stalked or attempted to accost other women; and the fact Ward maintained a considerable stockpile of pornographic material and women's lingerie in his home. Given the wealth of evidence against Ward, the district court concluded that there existed no reasonable probability that the results of the sentencing phase of Ward's trial would have been different had his trial counsel pursued and presented additional mitigation evidence.

After careful review of the record, we are of the same mind as the district court and conclude that Townley's investigation and presentation of mitigation evidence during the sentencing phase of Ward's trial were well "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. While mindful of the Supreme Court's guidance in Wiggins regarding the assessment of strategic choices and the reasonableness of investigations into mitigating evidence, we also recognize that "[i]t is reasonable – and not ineffective – for trial counsel to eliminate certain lines of presentation if he has misgivings about hurtful cross-examination and rebuttal witnesses." Hallford v. Culliver, 459 F.3d 1193, 1205 (11th Cir. 2006) (per curiam) (quotation marks and citation omitted). We have also observed that "[e]ven when trial counsel's investigation is less complete than collateral counsel's, trial counsel has not performed deficiently when a reasonable lawyer could have decided, in the circumstances, not to investigate." Id. (quotation marks and citation omitted).

Here, the record indicates that Townley was aware of the bulk of the mitigating evidence alluded to by appellate counsel during the state and federal habeas proceedings. This signals that he did conduct a reasonable investigation but chose not to present much of the evidence during the sentencing phase of Ward's trial. First, Ward's biological mother, Cora Jones, essentially refused to testify on

38

her son's behalf.[12]  This reluctance informed Townley's decision not to attempt to

present her testimony to the jury during the sentencing phase of the trial.  As stated

by Townley:

> If I have a witness in sentencing phase who does not want to be there
> and doesn't want to participate and is going to have to have [sic] an
> attachment and have a Sheriff's deputy bring them to court, that is
> usually not a witness that I want to introduce to bring sympathy in a
> sentencing phase, no.

R1-6, Exh. 62 at 399-400.

Turning to Townley's decision to forgo presentation of evidence relating to

Ward's adoptive parents and the environment in which they raised him, we find

Townley's rationale, as cited by the district court, quite persuasive.  After

---

[12] At the state habeas proceedings, Townley's legal assistant, Deana Jones, provided the following testimony regarding her efforts to contact Cora Jones:

> A [Deana Jones]: While we were in court even, I called her [Jones] because I had
> asked her, "If you won't come to court, if you will not let me come and get you, then
> will you please stay by the phone in case we need anything, I can give you a call?"
> She said "Okay, I can do that."  And then I called her several times, three or four
> times during court, and there was no answer.  So that night I called, and I left a
> message, and I said something to the effect of, "We don't need you.  I just want to
> talk to you.  Could you call me?"  And she did call then.  But that was it, she didn't
> answer.  So I asked her why she wasn't by the phone and she said she would be, and
> she said, that is the time that she said something about her laundry.
>
> . . . .
>
> Q: Let me ask you.  So was it apparent to you that she was trying to do everything
> she good [sic] to avoid coming to court for Mr. Ward?
>
> A: Yes.

R1-6, Exh. 61 at 160-61.

discussing Ward's upbringing at length with Ward himself, Townley concluded

that the introduction of evidence concerning his life with his adoptive parents

likely would have little effect on the jury. According to Townley, Ward

maintained good feelings towards his adoptive parents and was reluctant to

characterize their treatment of him as abusive.

> Q: And what did [Ward] tell you, and what was your, I guess, feeling about the environment that he was raised in by the Wards?
>
> A [Townley]: Poor; country; good people; strict; an adoptive father who was, in my feeling, too strict. But he basically had good feelings towards them.
>
>  . . . .
>
> Q: Did [Ward] feel like he had been abused by them?
>
> A: I think he would agree with me that his father was too strict. But [Ward], in some ways, felt like that he deserved it, and his father was doing it as a father as opposed to just some drunken fellow lashing out at his child at night.

Id. at 338. Moreover, Townley's concern that the jury might compare and contrast

Ward's behavior with that of his adoptive nephew (John Pettit, Jr.) appears

justified in light of Mr. Pettit's testimony at the state habeas proceeding.

> Q: Let me ask you this, Mr. Pettit, did you notice any type of different treatment that your grandparents gave you and your sister as opposed to the treatment that they gave Mr. Ward?
>
> A [Pettit]: I think that they treated [Ward] as a child, and they treated us as grandchildren, and there is a difference in that relationship. I

would not say that we were treated any worse or any better, but we were grandchildren, and he was their child.

Q: Let me ask you this. Did they look after you and provide a safe environment for you and your sister?

A: Yes.

Q: Did they also do that for [Ward]?

A: Yes.

R1-6, Exh. 61 at 136.

Finally, considering the circumstances presented to Townley at the sentencing phase of the trial, we agree with the district court that his decision to focus on residual doubt was objectively reasonable. At the state habeas proceeding, Townley articulated his decision-making process as follows:

Q: And what strategy did you eventually decide upon in the mitigation portion of this trial?

A [Townley]: Well, again, with the jury that we had and knowing the history of the juries in that area, the residual doubt, the non intentional nature of the actual death. . . .

Q: Your first witness was Lewis Evans with the G.B.I., top polygraphist?

A: Correct.

Q: How did that fit into your strategy in the penalty portion?

A: The residual doubt question.

41

Q: How did you feel that would impact upon the death part, his testimony?

A: That the jury had actually stayed out for a fairly substantial amount of time on guilt innocence, enough such that you knew there was some disagreement in the jury room. It would take a lot of time just to review all the physical evidence and documents that came in, but it went beyond that, which let me know that there were some jurors who had questions about his, a finding of guilt. And my feeling was that the polygraph, and hitting that first out of the shoot, might immediately with those jurors cause concern about whether they had done the right thing or the wrong thing in coming back with a guilty verdict.

R1-6, Exh. 62 at 335-36. We previously have catalogued those cases in our circuit in which we have noted the effectiveness of the residual doubt defense. See Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787-88 (11th Cir. 2003) (noting that "[c]reating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but 'is perhaps the most effective strategy to employ at sentencing'"); Stewart v. Dugger, 877 F.2d 851, 856 (11th Cir. 1989) ("Trial counsel made a strategic decision that in light of the atrocious nature of the offense, [the defendant's] only chance of avoiding the death penalty was if some seed of doubt, even if insufficient to constitute reasonable doubt, could be placed in the minds of the jury. . . . Trial counsel cannot be faulted for attempting to make the best of a bad situation."). In sum, we agree with the district court that the state courts' conclusion that trial counsel was not deficient is not contrary to nor an

42

unreasonable application of Supreme Court precedent. Because we conclude that trial counsel's performance at the sentencing phase of Ward's trial was not deficient, we need not consider Strickland's prejudice prong. See Holladay, 209 F.3d at 1248.

D. Ineffective Assistance of Counsel for Failure to Obtain an Independent Mental Health Expert

Ward argues that his trial counsel provided ineffective assistance by failing to obtain an independent mental health expert for the defense team. He contends that his trial counsel declined to obtain such an expert even though Ward's mental health was at issue and the trial judge had made funds available to the defense for the express purpose of obtaining a mental health expert. Ward challenges his trial counsel's reliance on the mental health evaluations ordered by the trial court and conducted by state experts who allegedly had a "bias and prejudice toward the State's position."[13] R1-6, Exh. 62 at 358. Moreover, Ward maintains that the mental health evaluation performed by the state experts was flawed in other respects, namely (1) that the purpose of the state's evaluation was to determine Ward's competence to stand trial and not to develop mitigating evidence; and (2)

_____

[13] After conducting their evaluation, the state mental health experts ultimately concluded that Ward suffered from anti-social personality disorder. At the state habeas proceeding, Ward's mental health expert, Dr. Mark Mills ("Mills") attempted to rebut that diagnosis and suggested that Ward suffered from fetishism instead.

43

the state's experts were not provided with information concerning Ward's

pornography collection or concerning his multiple crimes against other women.

The state habeas court made the following factual findings and legal

conclusions regarding this claim:

> [Ward] claims that defense counsel were ineffective in failing to obtain the assistance of an independent mental health expert. The Affidavit of Dr. Mark J. Mills is offered as evidence that the diagnosis of antisocial personality disorder was incorrect. However, it is clear that Dr. Mills' diagnosis of fetishism was based upon incomplete information, thus this testimony is not persuasive.

> Although the trial court granted defense counsels' Motion for Funds for Employment of Privileged, Competent Psychiatrist, "not every offer extended by the court must be accepted by defense counsel." Curry v. Zant, 258 Ga. 527, 528 (1998). The decision not to retain an independent mental health expert was based on several factors, including [Ward's] strong opposition to the presentation of any type of mental illness defense, the trial court's caveat that "counsel act[] reasonably in their selection and use of the expert," and the lack of indicators that a mental illness defense or mitigation evidence existed.

> Defense counsels' investigation into a potential mental illness defense and mitigation evidence was reasonable, as was the decision to pursue a trial strategy that did not require the retention of an independent mental health expert.

R1-6, Exh. 70 at 10-11 (citations omitted).

The district court concluded that the state habeas court's determination with

regard to Ward's mental health expert ineffective-assistance-of-counsel claim was

sound. According to the district court, Townley's decision not to obtain an

independent mental health expert to evaluate Ward was sound trial strategy and his decision not to pursue further expert evaluation of Ward's mental condition was reasonable. The district court based its determination on Ward's stated opposition to any kind of mental illness defense and Townley's assessment that no viable mental illness defense was possible.

In its decision, the district court cited Townley's testimony at the state habeas proceeding regarding Ward's opposition to a mental illness defense.

> [H]is position was I didn't do it. And he didn't feel like there was anything basically that was, that he had any kind of mental illness that would be important to the issues that we were trying, and basically had real strong feelings that, if anything, it would make it look like he did it, and we were trying to say that he did it but he was mentally ill or he had these mental problems. He just had real strong reactions about it.

R4-77 at 92 (citing R1-6, Exh. 62 at 290). The district court also noted that doctors from two separate facilities – Northwest Georgia Regional Hospital and Central State Hospital – evaluated Ward over the years and both independently diagnosed him with anti-social personality disorder. Again looking to Townley's testimony at the state habeas proceeding, the district court recounted how Townley believed the anti-social personality disorder diagnosis was harmful to Ward and, if presented in mitigation, would be seized upon by the state to good effect.

As regards other physical ailments that contributed to Ward's alleged mental illness, the district court noted that Townley testified that he was aware of Ward's prior automobile accident as well as his blackouts and headaches. The district court credited Townley's testimony that he duly investigated whether a possible head injury incurred in the automobile accident had any impact on Ward's mental capacity and noted that the tests performed on Ward indicated that no neurological abnormalities existed.

The district court also discussed Dr. Samuel Perri's ("Dr. Perri") conclusions after examining Ward prior to trial.[14] The district court noted that Dr. Perri's evaluation concluded that Ward did not present with any type of mental illness and highlighted Dr. Perri's later conclusion that Ward did not suffer from a multiple personality disorder. The district court summed up its analysis of the issue by relating Townley's testimony at the state habeas proceeding concerning his rationale for not pursuing a mental illness defense:

> A [Townley]: We had instructions from our client, plus I didn't find where we had anything that was of such significance that it was going to help us with the jury. And, if anything, I thought it might undermine our credibility somewhat with the jury.

_____

[14] The trial court ordered that Ward "be evaluated for the purpose of rendering an opinion with respect to the questions of his competency to stand trial, his degree of criminal responsibility, his intellectual level of functioning, [and] neurological disorders. . . ." R1-6, Exh. 59 at 319. Dr. Perri was the Senior Psychologist and Director of Forensic Services at the Northwest Georgia Regional Hospital who conducted that evaluation.

Q: And why would it undermine your credibility with the jury?

A: I didn't feel that this jury would be receptive to seeing photographs of a terribly decomposed body, hearing lots of testimony concerning similar transaction evidence, seeing boxes of men's magazines and lingerie that was cataloged, and then coming in with something that wasn't pretty darn substantial on mental illness, that, if anything, I thought that it might hurt us, and that the jury first would feel like we were just trying to make excuses. . . .

R4-77 at 97-98.

The district court ultimately concluded that the state habeas court's decision to reject Ward's mental health expert ineffective-assistance-of-counsel claim was not contrary to clearly established law nor an unreasonable application of clearly established law. The district court also found that, given the nature and extent of the evidence before the jury, there existed no reasonable probability that Ward's sentence would have been different even if Townley had obtained an independent medical health expert.

Our review of the record reveals no grounds for disturbing the district court's decision regarding Ward's mental health expert ineffective-assistance-of-counsel claim. We find Townley's conclusion that no viable mental illness defense existed eminently reasonable given the circumstances at the time of the trial. First, the record affirms Townley's assertion that he discussed the issue of a possible mental illness defense with Ward on multiple occasions and was repeatedly

47

rebuffed. Second, we are impressed with the fact that Townley continued to investigate the possibility of a mental illness defense after the proposal was scotched by Ward. We reference Townley's testimony during the state habeas proceedings where he describes a memorandum in which he memorialized his communications with Dr. Perri.

> A [Townley]: Apparently, this was a memo to the file from some discussions or communications with Dr. Perri. "Ward does not know that [Townley] considers it a possibility. Doesn't want Ward to know [Townley] thinks he may have mental problems. Will give you details if you need them. . . . In this case the evidence is overwhelming that he did it. He is facing the death penalty. We can probably work out a plea where he will not get the chair but Ward will not let him," which is myself, "do so. Is adamant that he is not guilty."

> Q: Let me ask you this, Mr. Townley, in relation to that. Despite the fact that he was adamant and he didn't want you to pursue any type of mental health defense, did you nevertheless still question doctors and investigate that?

> A: Yes.

R1-6, Exh. 62 at 294-95.

The record also supports Townley's assertion that he was not able to develop a viable mental illness defense and consequently elected not to pursue such a defense at trial. Hence, in Townley's estimation, the necessity of an independent mental health expert was much reduced. We consider the circumstances presented to Townley before the trial commenced. His client adamantly opposed any mental

48

illness defense. A court-ordered mental evaluation of Ward yielded no indication that Ward suffered from mental illness[15] and follow-up conversations with the state psychologists confirmed that assessment. Although Townley continued to investigate the possibility of a mental illness defense even after the idea was rejected by his client, Townley ultimately concluded that the defense was not viable. Indeed, in his reasoned opinion, the presentation of any evidence of mental illness during the sentencing phase of the trial would have been seized upon by the state, who, in turn, "would have used [it] to drive Mr. Ward directly to the chair." R1-6, Exh. 62 at 313. Moreover, we are not persuaded by the affidavit testimony of Ward's habeas mental health expert, Dr. Mills. As we have held many times before, "the mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." Davis v. Singletary, 119

---

[15] Dr. Perri made the following findings regarding Ward's alleged neurological abnormalities stemming from a previous automobile accident:

> On March 12, 1991 Mr. Ward was referred to Central State Hospitals' Department of Neurology. During this evaluation Mr. Ward stated that he was in an automobile accident in July of 1989 in which he hit the windshield. Subsequently he complained of headaches, nausea, vomiting and some visual problems. He also reported having four blackout spells since September of 1990. However, the neurological examination which included an EEG, brain scan, and skull series were within the normal limits and no neurological abnormalities were found.

R1-6, Exh. 59 at 320.

F.3d 1471, 1475 (11th Cir. 1997). We conclude that the district court correctly determined that the state courts' conclusion that trial counsel was not deficient is not contrary to nor an unreasonable application of Supreme Court precedent. Again, because we conclude that trial counsel's performance was not deficient, we do not reach the prejudice prong of the Strickland analysis.

E. Improper Bailiff-Jury Communication

Ward next argues that his constitutional right to a fair trial and a reliable sentence were violated when a bailiff improperly responded to a juror's question about parole during the penalty phase of trial. We agree.

Three jurors submitted affidavits on this issue and one of those jurors testified live at a state habeas hearing. Juror Kenneth Craig's affidavit indicates that he personally questioned a bailiff as to whether life without parole was a sentencing option:

> One of the things that I know I was worried about was whether he would ever be able to get out and do something like this again. I really did not think that he deserved the death penalty, partly because I had some strong doubts about his guilt. But I believed at the time – and other jurors shared this belief – that a life sentence meant that he would be able to get out on parole after a while.

> Before we sentenced Ward to death, I asked one of the bailiffs – a woman I think – if life and death were our only options. I wanted to know whether life really meant life and, if it didn't mean life, whether there was a life without parole choice. But the bailiff told me that

50

jurors couldn't ask questions like that, that the judge's instructions were what we had to go on. I never got an answer to my question.

. . . .

Today I wish that we had had the choice of sentencing Ward to life without the possibility of parole. I know that if we had had that choice, I would definitely have voted for a life sentence, because I just wanted to be sure that a person like him would be off the streets, whether or not he was actually guilty of the crime.

R1-6, Exh. 65 at 882-83.

Similarly, juror Keith Dunsmore signed an affidavit stating that the jury asked a bailiff about the possibility of sentencing Ward to life without parole:

Other jurors also had some uneasiness with the death penalty in this case. We certainly did not want Mr. Ward to be out on the street. I remember that we asked a bailiff whether we could sentence Mr. Ward to life without the possibility of parole. The bailiff returned with the answer that such a sentence was not an option. If the life without parole option had been available at the time, I and other jurors may well have decided that this was the appropriate sentence.

Id. at 888. Dunsmore later testified at a state habeas hearing that, although he could not recall if he asked the bailiff or another juror the question about life without the possibility of parole, the issue was "talked about, and we found out that we couldn't do it, as a jury we couldn't do that." R1-6, Exh. 64 at 722-23.

Finally, juror James Hix submitted an affidavit reflecting some jurors' concern that Ward might commit future crimes if released from prison someday:

51

One of the things I and the other jurors were especially concerned about was the possibility that Mr. Ward might get out of prison someday and commit another violent crime. We just didn't think that a life sentence truly meant life, and that he would eventually get out of prison. If we had had the option of life without the possibility of parole as a sentence, I would have seriously considered a life sentence.

R1-6, Exh. 65 at 885-86. Hix's affidavit does not mention any questions posed by the jury to a bailiff on the issue of parole eligibility.

The state habeas court ruled that the jurors' affidavits were inadmissible under O.C.G.A. § 17-9-41 because the affidavits sought to impeach the jury's verdict and did not fall within any exception to the rule. The court also found the affidavits were irrelevant because life without parole was not a sentencing option at the time of Ward's trial, and thus it did not matter whether the jurors wished in hindsight that it had been an option. Finally, the court noted that "the discussion with the Bailiff, as stated by the jurors, is not the sort that – perhaps it should have been reported to the judge, and then from the judge to the lawyers, but the deputy's response was a proper response, and no harm done." R1-6, Exh. 61 at 24.

With respect to Dunsmore's live testimony, the state habeas court likewise stated that it would not consider his testimony, presumably for the same reasons that it excluded the affidavits. Specifically, the court told the parties that, "none of these affidavits, I want to make it clear, either yours or [the state's] or the

52

testimony [of juror Dunsmore] that we are about to take under oath, are going to be considered by me at this point." R1-6, Exh. 64 at 707. Instead, the court explained that "they will be part of the record, not that I'm going to consider," but so that "[t]he appellate court can look at that issue." Id. at 707-09.

In its orders denying habeas relief, the state habeas court found this issue to be procedurally defaulted because it was not raised on direct appeal. The court found no "cause" to overcome the procedural bar because (1) there was no external factor to preclude Ward from previously raising the claim, and (2) Ward did not receive ineffective assistance of counsel. R1-6, Exh. 82 at 3. Additionally, the court found no actual prejudice to overcome the default. These conclusions were based on the court's findings that there was "no evidence that there was any question posed by the jury that was not answered by the trial court in open court, and no evidence to support [Ward's] allegation that a fifth question was asked about parole eligibility and not relayed to the trial judge." Id. Neither of the state court's orders mention the three jurors' affidavits or Dunsmore's live testimony.

The district court agreed with the state habeas court that this issue was procedurally defaulted, and that Ward had not established cause or prejudice to excuse the default, nor a fundamental miscarriage of justice. In an abundance of caution, the district court later addressed the merits of Ward's claim. After reciting

53

the state habeas court's findings and conclusions in full, the district court summarily concluded that the state habeas court's decision was not contrary to, or an unreasonable application of, clearly established federal law and that the decision was not based on an unreasonable determination of the facts.

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment's Due Process Clause, protects a criminal defendant's right to a fair trial by a panel of impartial jurors. Parker v. Gladden, 385 U.S. 363, 364, 87 S. Ct. 468, 470 (1966). Integral to this right is the requirement that a jury base its verdict on the evidence presented at trial. See Turner v . State of Louisiana, 379 U.S. 466, 472, 85 S. Ct. 546, 549 (1965). "This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." Id.

A jury is presumed to have acted impartially. See United States v. Siegelman, 561 F.3d 1215, 1237 (11th Cir. 2009) (per curiam). A defendant may rebut this presumption by making a colorable showing that juror exposure to extraneous information has violated his right to an impartial jury. See id. If such a showing is made, then prejudice is presumed. See id. This presumption of prejudice applies to "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury . . . if

54

not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 451 (1954). A presumption of prejudice is not conclusive, however. Id. The government may rebut the presumption by showing that the improper communication was harmless. See id.; Siegelman, 561 F.3d at 1237.

We must initially determine whether Ward has procedurally defaulted this claim by failing to raise it prior to his state habeas proceedings. "Whether a particular claim is subject to the doctrine of procedural default . . . is a mixed question of fact and law, which we review de novo." Judd, 250 F.3d at 1313. The state habeas court relied on Georgia's procedural default rule as stated in Turpin v. Todd, 493 S.E.2d 900 (Ga. 1997):

> A procedural bar to asserting a claim on habeas corpus arises if the defendant failed to timely object to any alleged error or deficiency at trial or on appeal. The procedural bar, however, may be overcome if the petitioner shows, first, an adequate cause for failing to raise the issue earlier and second, actual prejudice resulting from the alleged error or errors.

Todd, 493 S.E.2d at 905 (footnotes omitted); see also O.C.G.A. § 9-14-48(d). Ward argues that because Todd was decided five years after the Georgia Supreme Court affirmed Ward's conviction and sentence, Georgia's procedural default rule was not firmly established and consistently followed at the time of Ward's trial and

55

direct appeal. Consequently, Ward contends that <u>Todd</u> was not an adequate basis for the state habeas court's procedural default ruling.

We disagree. A state procedural bar is based on an adequate state procedural rule if that rule is "firmly established and regularly followed – that is, not applied in an arbitrary or unprecedented fashion." <u>Lynd v. Terry</u>, 470 F.3d 1308, 1313 n.4 (11th Cir. 2006) (per curiam). <u>Todd</u> was based on the well-established precedent of <u>Black v. Hardin</u>, 336 S.E.2d 754, 755 (Ga. 1985), which was decided six years *before* Ward's trial. See <u>Todd</u>, 493 S.E.2d at 905 n.12. In <u>Black v. Hardin</u>, the Georgia Supreme Court held that a defendant will be procedurally barred in habeas from raising "*any* alleged error or deficiency" not timely objected to at trial or raised on appeal, unless the defendant can show cause and actual prejudice to overcome the default, or that a miscarriage of justice would result if the error is not considered. <u>Hardin</u>, 336 S.E.2d at 755. <u>Todd</u> merely applied <u>Black v. Hardin</u> in holding that Todd's failure to raise a juror-bailiff claim on direct appeal resulted in the claim's procedural default. See <u>Todd</u>, 493 S.E.2d at 905. Georgia's procedural default rule was thus firmly established and consistently followed prior to Ward's trial and appellate proceedings. Accordingly, we conclude that the state habeas court's procedural default ruling rested on an adequate state law ground. See <u>Lynd</u>, 470 F.3d at 1313-14 (concluding that Georgia's procedural default rule, as

56

stated in Black v. Hardin, provided an adequate and independent state law ground for denial of a claim).

Because the claim is procedurally defaulted, Ward must establish cause and actual prejudice to excuse his default. See Jefferson v. Hall, 570 F.3d 1283, 1309 (11th Cir. 2009). Ward argued in state court that the cause requirement was satisfied by the bailiff's failure to report the jury's question to the court and to the parties. Alternatively, Ward claimed that cause was established by the ineffective assistance of his counsel in failing to raise the issue in the motion for new trial or on direct appeal. As noted, the state habeas court rejected both arguments.

We disagree with the state habeas court's conclusion that Ward has not shown sufficient cause to overcome the procedural bar. "Cause exists if there was 'some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule.'" Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008) (quoting Murray, 477 U.S. at 488, 106 S. Ct. at 2645). An external impediment includes "interference by state officials" that prevented a petitioner from raising a claim. Id.; see also Murray, 477 U.S. at 488, 106 S. Ct. at 2645. The external impediment in this case stems from the failure of the bailiff and/or the trial judge to inform Ward or his counsel about the jury's question concerning parole.

We recognize that the state habeas court found no evidence that the jury asked any question that was not answered by the trial judge in open court, but this finding is "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As discussed earlier, we must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. See id. § 2254(e)(1); Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001). Clear and convincing evidence entails proof that a claim is "highly probable," a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt. United States v. Owens, 854 F.2d 432, 436 n.8 (11th Cir. 1998) (quotation marks and citation omitted). The Supreme Court described this standard as "demanding but not insatiable" and cautioned that "[d]eference does not by definition preclude relief." Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (quotation marks and citation omitted).

Here, the jurors' affidavits and Dunsmore's testimony contain clear and convincing evidence that the jury questioned a bailiff about the possibility of sentencing Ward to life without parole, and that the answer was not given in open court. Both Craig and Dunsmore stated in their affidavits that a juror asked the bailiff whether the jury could sentence Ward to life without parole. Craig stated

that he himself asked that question. In his live testimony, Dunsmore could not recall who asked the question but he knew that "it was talked about and we found out we couldn't do it, as a jury we couldn't do that." R1-6, Exh. 64 at 722-23. According to both Craig and Dunsmore's affidavits, the bailiff responded to the jury's question. It is unclear from the record whether the bailiff's answer was dictated by the trial court or was merely a response from the bailiff.[16] Either way, it is undisputed that the trial court did not instruct the jury not to consider parole, as was required under Georgia law at that time once a question about parole was asked. See Quick v. State, 353 S.E.2d 497, 503 (Ga. 1987) ("If, and only if, the jury asks to be instructed about the possibility of parole, the court should mention the issue only to the extent of telling the jury in no uncertain terms that such matters are not proper for the jury's consideration.")

The state habeas court erroneously determined that the jurors' affidavits, insofar as they pertained to this issue, were inadmissible under O.C.G.A. § 17-9-41. The latter rule prohibits the use of jurors' affidavits to impeach their verdict.

----

[16] The state asserts that juror Dunsmore testified that he "saw the bailiff go into the judge's chamber, give the judge the question [about life without parole] and return with the answer from the judge." Brief of Respondent/Appellee at 56. This is an inaccurate rendition of Dunsmore's testimony, however. Dunsmore testified that it was his impression that questions asked of the bailiff by the jury were given to the trial judge for an answer. R1-6, Exh. 64 at 723. When asked how he got that impression, Dunsmore testified, "If I remember, one occasion we saw them actually go to the Judge's room and give him the question and came back from it. They had told us that they had gotten the answer from the Judge." Id. at 724. Dunsmore was not asked, nor did he specify, which jury question this recollection addressed.

59

See O.C.G.A. § 17-9-41.  However, the Georgia Supreme Court has held that a bailiff's comments to a juror concerning a defendant's parole eligibility constitutes an exception to this rule.  See Todd, 493 S.E.2d at 903.  This is because "the general prohibition against allowing a jury to impeach its verdict cannot be applied to emasculate a defendant's constitutional right to a fair trial, particularly when his life hangs in the balance."  Id.[17]  In Todd, which was decided shortly before Dunsmore testified at the final state habeas hearing, the Georgia Supreme Court specifically rejected the idea that the rule against impeaching verdicts precluded the habeas court from considering the affidavits of three jurors about a bailiff-jury communication concerning parole.  See id. at 902-03.  Like the juror affidavits in Todd, the juror affidavits here alleged a bailiff-jury communication about the possibility of parole which pertained to Ward's right to a fair trial.  The state habeas court therefore erred in excluding the affidavits under O.C.G.A. § 17-9-41.

Furthermore, there is no contrary evidence in the record to refute the jurors' affidavits that a jury-bailiff exchange occurred on the issue of parole.  When these affidavits are considered, in addition to Dunsmore's live testimony, it is clear that the state court's findings are incorrect and "an unreasonable determination of the

_____

[17] Similarly, the United States Supreme Court has noted that an exception to the common-law rule barring juror testimony to impeach a verdict includes situations where an extraneous influence affected the jury's deliberations, such as a bailiff's improper comments about the defendant's guilt in Parker, 385 U.S. at 363-66, 87 S. Ct. at 470-71.  See Tanner v. United States, 483 U.S. 107, 117, 107 S. Ct. 2739, 2745-46 (1987).

facts in light of the evidence presented[.]"[18] 28 U.S.C. § 2254(d)(2); compare

Crowe v. Hall, 490 F.3d 840, 847 (11th Cir. 2007) (concluding that the petitioner

failed to rebut the presumed correctness of the state habeas court's factual finding

because in opposition to the one juror affidavit alleging an improper bailiff

comment, the record contained denials that the incident occurred from three other

jurors and two bailiffs). Accordingly, we conclude that Ward established sufficient

cause to excuse his procedural default based on the state's concealment of the

jury's question regarding parole.[19]

Ward must still demonstrate actual prejudice. See Jefferson, 570 F.3d at

1309. Actual prejudice means more than just the possibility of prejudice; it

requires that the error "worked to his *actual* and substantial disadvantage, infecting

his entire trial with error of constitutional dimensions." United States v. Frady,

456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982). In Frady, the Court found no

actual prejudice because there was "no substantial likelihood" that the jury would

have found the defendant guilty of manslaughter instead of first degree murder "if

only the malice instructions had been better framed[.]" Id. at 172, 102 S. Ct. at

---

[18] Specifically, we find incorrect the state habeas court's findings of "no evidence that there was any question posed by the jury that was not answered by the trial court in open court, and no evidence to support [Ward's] allegation that a fifth question was asked about parole eligibility and not relayed to the trial judge." R1-6, Exh. 82 at 3.

[19] Given our conclusion, we need not address Ward's alternative argument that cause was established by his counsel's ineffective assistance in failing to raise this claim on appeal.

61

1596. Moreover, "even if the law presumes prejudice for certain errors when they are timely raised, a convicted defendant who is seeking to overcome a procedural bar does not have the benefit of that presumption of prejudice, and must instead meet the actual prejudice test set forth in *Frady*." Jefferson, 570 F.3d at 1309. Yet whether we apply a presumption of prejudice or undertake a specific analysis, "the ultimate inquiry" remains the same: "Did the intrusion affect the jury's deliberations and thereby its verdict?" United States v. Olano, 507 U.S. 725, 739, 113 S. Ct. 1770, 1780 (1993).

In light of the uncontroverted evidence presented, we conclude that Ward was actually prejudiced by the improper bailiff-jury communication. All three juror affidavits express a concern that Ward would be released on parole if he were sentenced to life imprisonment. This concern was great enough to prompt the jury to ask a bailiff whether Ward could be sentenced to life without the possibility of parole. Instead of the trial court dispelling any consideration of parole through a curative instruction,[20] the bailiff responded to at least one juror that life without

---

[20] The Georgia Supreme Court suggested that a trial court give the following instruction if a juror asked about the possibility of parole:

> "You shall not consider the question of parole. Your deliberations must be limited to whether this defendant shall be sentenced to death or whether he shall be sentenced to life in prison. You should assume that your sentence, whichever it may be, will be carried out."

Quick, 353 S.E.2d at 503 n.3. In Ward's case, although the trial court instructed the jury to

parole was not an option. This was information that the bailiff should not have given and that the jury should not have considered under Georgia law at that time. See Quick, 353 S.E.2d at 503 (reaffirming that "a defendant's parole eligibility is not, and ought not to be, an issue considered by the jury in the sentencing phase of a death penalty case"). More importantly, this improper exchange violated Ward's Fourteenth Amendment due process right to have the jury decide his punishment based on the evidence presented in court, in accordance with the rules and instructions of the court and with the full knowledge of the parties. See Parker, 385 U.S. at 364, 87 S. Ct. at 470; Remmer, 347 U.S. at 229, 74 S. Ct. at 451.

By advising that life without parole was not an option, the bailiff left the impression that Ward could or would be released on parole if the jury sentenced him to life imprisonment.[21] The bailiff therefore reinforced the pre-existing belief of Craig and other jurors that "a life sentence meant that [Ward] would be able to get out on parole after a while." R1-6, Exh. 65 at 882. Furthermore, the bailiff's response affected the deliberations of, at a minimum, three jurors.[22] According to

presume that Ward would spend the rest of his life in prison if sentenced to life imprisonment, the jury was never instructed that it should not consider parole.

[21] Although a jury could not sentence a capital defendant to life without parole at the time of Ward's conviction, it is undisputed that the Georgia Board of Pardons and Parole had the discretion to deny him parole. Thus, it was possible that Ward would have spent the rest of his life in prison if he had been sentenced to life imprisonment.

[22] Even if only three jurors were influenced by the bailiff's comments, the Supreme Court has emphasized that a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and

63

Dunsmore, if life without parole had been available at the time, "I and other jurors may well have decided that this was the appropriate sentence." R1-6, Exh. 65 at 888. Likewise, Hix states that he "would have seriously considered a life sentence" if life without parole was an option. Id. at 886. Craig expresses the strongest sentiment, asserting that "I would definitely have voted for a life sentence" had the option of life without parole existed. Id. at 883. These statements reflect that the jury not only considered parole in determining Ward's sentence, but that a key factor in the sentencing decision of several jurors was the bailiff's instruction that the jury could not sentence Ward to life without the possibility of parole.

The state argues that no actual prejudice can be shown because life without parole was not an option for Ward under Georgia law at that time, and thus any instruction to this effect was a correct statement of the law. This argument ignores the fact that the jury was not supposed to be considering parole in the first place. See Quick, 353 S.E.2d at 503. It also ignores the fact that Georgia law required the court to instruct the jury "in no uncertain terms" not to consider parole once it asked a question about parole. Id. Finally, this argument ignores the violation of Ward's Sixth Amendment right to be sentenced by jurors who are free from

unprejudiced jurors." Parker, 385 U.S. at 366, 87 S. Ct. at 471.

64

external influence and who render their verdict solely on the basis of the evidence presented during trial. See Parker, 385 U.S. at 363-66, 87 S. Ct. at 470-71 (concluding that a bailiff's comments that a defendant was guilty and that the Supreme Court would correct "anything wrong" violated the defendant's Sixth Amendment right to an impartial and unprejudiced jury).

Bearing in mind that only one vote in favor of life imprisonment was needed to avoid a death sentence, we conclude that there is a substantial likelihood that the jury would not have returned a death verdict had the trial court, in lieu of the bailiff's response, properly instructed the jury in open court not to consider parole. See Turpin v. Todd, 519 S.E.2d 678, 683 (Ga. 1999) (affirming the habeas court's finding that a defendant was actually prejudiced by a bailiff's response to a juror's question about parole because, inter alia, the issue of parole played a major role in the sentencing phase deliberations and the jury was never instructed that parole must not be considered). Put simply, we find a substantial likelihood that the improper bailiff-jury communication prejudiced Ward's chances of being sentenced to life imprisonment. Compare Frady, 456 U.S. at 174, 102 S. Ct. at 1597-98 (finding "no substantial likelihood the erroneous malice instructions prejudiced Frady's chances with the jury").

Given that Ward has established cause and actual prejudice to overcome his procedural default, we may now determine whether a constitutional violation merits habeas relief. Ward has made a colorable showing that the jury was exposed to extraneous information when the bailiff informed a juror that life without parole was not a sentencing option. Such exposure is presumptively prejudicial. See Remmer, 347 U.S. at 229, 74 S. Ct. at 451; Siegelman, 561 F.3d at 1237. As noted earlier, the government may rebut this presumption by carrying its heavy burden of showing that the improper communication was harmless. See Siegelman, 561 F.3d at 1237. "An error is harmless unless there is a reasonable likelihood that [it] affected the defendant's substantial rights." United States v. Khanani, 502 F.3d 1281, 1292 (11th Cir. 2007) (quotation marks and citation omitted). Reversal requires that the error had "a substantial influence on the outcome of the case." Id. In assessing harmless error, we must consider all the circumstances, including any jurors' testimony, the nature of the extrinsic evidence, the manner in which the extrinsic evidence reached the jury, and the strength of the government's case. See id. at 1291; Siegelman, 561 F.3d at 1237.

An assessment of these factors yields the conclusion that the improper communication was not harmless in this case. The nature of the extrinsic evidence concerned the possibility of parole. As we have explained, the jury's consideration

66

of this issue was strictly forbidden by Georgia law, see Quick, 353 S.E.2d at 503, and an infringement of Ward's constitutional due process right to have the jury base its verdict on the evidence presented at trial. See Parker, 385 U.S. at 364, 87 S. Ct. at 470; Remmer, 347 U.S. at 229, 74 S. Ct. at 451. The manner in which this evidence reached the jury – through the bailiff – also weighs against a finding of harmless error. The Supreme Court has recognized that "the official character of the bailiff – as an officer of the court as well as of the State – beyond question carries great weight with a jury[.]" Parker, 385 U.S. at 365, 87 S. Ct. at 470; see also Johnson v. Wainwright, 778 F.2d 623, 627 (11th Cir. 1985) (noting that "a bailiff's exercise of his official duties is likely to give him added legitimacy in the eyes of a jury"). The fact that a bailiff provided the extrinsic evidence to the jury here enhances the likelihood that the jury credited and relied on this information.

With respect to the strength of the government's case, the Georgia Supreme Court stated only one sentence: "The evidence, although circumstantial, supports the conviction." Ward, 417 S.E.2d at 134. Both Craig and Dunsmore stated in their affidavits that the circumstantial nature of the evidence created doubts about Ward's guilt. Dunsmore went so far as to say that, "I really did not think that he deserved the death penalty, partly because I had some strong doubts about his guilt." R1-6, Exh. 65 at 882. During the penalty phase, the state relied on the facts

67

of the crime to argue that the killing involved a depraved mind and torture to the victim, thereby supporting the statutory aggravator of an outrageous or wantonly vile murder. The jury did not find this statutory aggravator, however. Instead, it based its death verdict on Ward's prior conviction for a capital felony and its finding that Ward committed the murder while committing another capital felony (kidnaping with bodily injury). The circumstantial nature of the government's case and the lack of overwhelming evidence bolster our conclusion that there is a reasonable likelihood the improper bailiff-jury communication affected Ward's constitutional due process right to a fair penalty phase hearing and a reliable sentence. Consequently, the error was not harmless.

We do not take lightly our decision to reverse a death sentence rendered by a jury eighteen years ago. Nevertheless, the record establishes that the improper bailiff-jury communication violated Ward's constitutional rights and prejudiced him. Accordingly, he is entitled to a new penalty phase hearing.

F. Brady Claims

Ward next contends that the state withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. at 87, 83 S. Ct. at 1196-97. Specifically, Ward relies on three alleged Brady violations. First, Ward alleges that the state failed to turn over a report that might have been used to impeach the testimony of a key

68

state witness. Second, Ward contends that the state withheld investigative notes which undermined the state's assertion at trial that Ward had made an unexpected visit to the victim's house – ostensibly to check on a well. Third, Ward argues that the state suppressed evidence that someone else committed the murder for which he was convicted.

Ward initially raised his <u>Brady</u> claim in his direct appeal to the Georgia Supreme Court.[23] Ward again raised the claims in his first amended state habeas petition, albeit in a different structure. In his post-evidentiary hearing brief in support of his amended state habeas petition, Ward fashioned his <u>Brady</u> claims in a form substantially similar to that now before us.

The state habeas court made the following findings and conclusions with regard to Ward's <u>Brady</u> claims:

> [Ward] alleges that the State failed to provide defense counsel with the following items of evidence, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (83 S. Ct. 1194, 10 L. Ed. 2d 215) (1963):
>
> A. Calhoun City police officer's report regarding GBI Agent's questioning of [Ward] in the Donna Rich case.
> B. GBI Agent's reports regarding criminal incidents where [Ward] was a suspect, but the victims could not identify him as the perpetrator.

---

[23] At this stage, Ward's claim was not fully developed and touched only on the first of Ward's three <u>Brady</u> violations.

C. Walker County deputy sheriff's notes regarding reports that the victim had been seen leaving the house in her car, crying, with an unidentified person.

D. Walker County deputy sheriff's note stating that the victim had expected someone to come over and check the well.

E. Face sheet for GBI polygraph of Jerry Wayne Alexander, stating the reason for his questioning regarding the fire at Richard Puryear's house.

F. Walker County deputy sheriff's note stating that Puryear had said the victim's gown was in the house that burned.

G. Donna Rich's guilty plea in Floyd County to a theft by taking charge.

H. Walker County deputy sheriff's notes regarding the daughter of the victim responding to the sight of other men.

I. Walker County deputy sheriff's notes regarding the victim's background.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, supra at 87. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Rogers v. State, 257 Ga. 590, 592 (3) (1987), quoting United States v. Bagley, 473 U.S. 667 (105 S. Ct. 3375, 87 L. E. 2d 481) (1985).

After consideration of each of these items of evidence in the context of the case as presented to the jury, the Court finds no reasonable probability that the result would have been different with their disclosure. As [Ward] has not established a Brady violation, his claims under Giglio v. United States, 405 U.S. 150 (92. S. Ct. 763, 31 L. Ed. 2d 104) (1972), also fail.

R1-6, Exh. 70 at 12-14.

70

The district court next entertained the claims. After reciting the state habeas court's findings, the district court concluded that the state habeas court's "rejection of [Ward's] claims relating to the alleged suppression of evidence was not contrary to, or an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts." R4-77 at 66-67.

As correctly summarized by the state habeas court, Brady counsels that once a defendant requests the discovery of any favorable evidence material to either guilt or sentence, the prosecution's suppression of such evidence, whether in good or bad faith, violates due process. See Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. The prosecution's duty extends beyond disclosing such favorable evidence to "learn[ing] of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995). We note that this duty exists whether or not the prosecution knew of the existence of the evidence if the evidence was in the possession of the government or generally provided only to governmental entities. See Martinez v. Wainwright, 621 F.2d 184, 186-87 (5th Cir. 1980). We also have held that there is no suppression if the defendant knew of the information or had equal access to obtaining it. See Maharaj v. Sec'y for the Dep't of Corr., 432 F.3d 1292, 1315 n.4 (11th Cir. 2005).

71

We are well acquainted with the standard for establishing a Brady violation. In order to be successful, a petitioner must show that: (1) the prosecution possessed evidence favorable to the accused, because it was either exculpatory or impeaching, and did not disclose it to the defense; "(2) that evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued." Kelley v. Sec'y for the Dep't of Corr., 377 F.3d 1317, 1354 (11th Cir. 2004). "Evidence is material so as to establish prejudice only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quotation marks and citation omitted).

We review the district court's decision regarding Ward's Brady claims de novo, by determining whether the state habeas court, in denying the claims, "misapplied Supreme Court precedent or unreasonably determined the material facts." Gary v. Hall, 558 F.3d 1229, 1256 (11th Cir. 2009). After careful consideration of the record, we agree with the district court and conclude that the state habeas court's rejection of Ward's Brady claims was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an

72

unreasonable determination of the facts. We address each alleged <u>Brady</u> violation in turn.

1. Impeachment Evidence

Ward contends that he has made the requisite showing of materiality with regard to a report ("Jackson report") by Randy Jackson, a police officer with the Calhoun City Police Department. He maintains that had he had the allegedly withheld report at trial, "the result of the proceeding would have been different." <u>Kelley</u>, 377 F.3d at 1354. According to Ward, the Jackson report could have been used to impeach the trial testimony of Special Agent Del Thomasson ("Thomasson"). Thomasson and Jackson conducted an interview with Ward about Ward's participation in a different crime (the Donna Rich kidnaping and rape)[24]. During the interview, Ward made incriminating statements about the Gilbreath murder. At pretrial hearings on the voluntariness of Ward's statement, Thomasson testified that Ward first broached the subject and it was only at that point that Thomasson followed up with questions about the Gilbreath murder. Ward argues that the allegedly suppressed Jackson report contradicts Thomasson's testimony at the pretrial hearing. Armed with the Jackson report, Ward maintains that his

_____

[24] Special Agent Keith Sitton also was present during the interview in question.

statement to Jackson and Thomasson likely would have been suppressed, thus undermining confidence in the outcome of his trial.

The Jackson report consists of one type-written page and reads as follows:

On 01-18-90 at approx. 10:45 AM, I talked with James Ray Ward after he requested to see me without his attorney.

I readvised James Ray Ward of his Constitutional Rights and verbally advised he could only talk to me if he fully understood that since an attorney was already appointed I couldn't talk to him. He stated he knew and he signed the bottom of the form again which stated a request from him to talk to me about rape without his attorney. G.B.I. Agents Sitton and Thomason [sic] were present.

Jamie stated he wanted to talk to me about an electrical instrument taken in a search of his residence and that it was not the one used. He stated the stun gun was supposed to be still there in the house as far as he knew. I told him I only had pictures of what he described and the sheriff office, to my knowledge, still had it.

Jamie was talking a lot about what had happened and I advised him that our investigation was complete. Jamie then stated, do you want to clear up a lot of crimes, felonies and misdemeanor's [sic] you haven't arrested anyone on yet. At this time Agent Thomason [sic] asked him, what kind, and asked him did he know anything about the rape and murder of a lady in Walker Co.

Jamie gave a story of his childhood and gave statements acknowledging he knew her but would not directly say he killed her. Indirectly he would talk about black out spells because of liquor and anphetamines [sic], comtemplating [sic] suicide, and would say he couldn't remember going there. Jamie couldn't explain why he had what item's [sic] Walker Co. and G.B.I. had recovered from his residence; denying he knew of them.

R1-6, Exh. 65 at 909.

74

At the hearing, Thomasson stated the following[25]:

> A [Thomasson]: [Ward] went in, as the statement says, went into sort of a rambling conversation with Mr. Jackson, and continued on for several minutes, and then, he subsequently turned to me, Detective Jackson or o[n] side, and I was sitting over on the other side, in a chair, and that is when he turned to me and addressed the Gilbreath investigation.
>
> Q: Did you do anything to bring that to his attention?
>
> A: No, sir, I did not.
>
> Q: Did you ask him any questions in relation to the Gilbreath matter?
>
> A: No, sir, I did not.
>
> Q: Did you interrogate him or drop a word at that point or say anything to or anything he could have construed as a question?
>
> A: No, sir, not until after he brought it up that is when I began to talk to him about it.

R1-6, Exh.6 at 347. Thomasson's testimony largely mirrors that of Agent Sitton, who was also present during the interview. According to Sitton,

> [a]fter [Ward] was mirandized, he wanted to talk to Investigator Jackson about some type of pain device that was taken from the house, and inquired as to that, and then gave a statement as to his background, the problems that he has had, and wanted some detail about the alcohol and drugs and then he focused his attention to Agent Thomasson, talking about the Walker County case [the Gilbreath murder].

---

[25] We note that, prior to the commencement of the interview, Thomasson was introduced to Ward as the agent investigating the Gilbreath murder.

R1-6, Exh. 6 at 260. Finally, we find it significant that Ward's excerpt from the Jackson report presented in his initial brief on appeal to us redacts language that, in our view, is highly relevant: "Jamie then stated, do you want to clear up a lot of crimes, felonies and misdemeanor's [sic] you haven't arrested anyone on yet." R1-6, Exh. 65 at 909. After careful consideration of the whole record, we are confident in our assessment that the Jackson report was not material, especially in light of the fact that Ward was on notice that the Gilbreath murder investigation was on Thomasson's plate before he offered to "clear up" additional crimes that had not been solved. Consequently, we conclude that Ward has not made a sufficient showing to establish a Brady violation with regard to the report.

2. Investigative Notes Concerning Unexpected Well Visit

Ward's next argument concerns Thomasson's testimony at trial that Ward admitted going to the Gilbreath home a second time ostensibly to check on a previously drilled well. At trial, the prosecution presented testimony from Billy Joe Gilbreath, the victim's husband, that he had had no problems with the well and had not requested anyone to come check on it. This testimony was corroborated by Fred Dukes, another employee of Jefford's Well Drilling.[26] Moreover, Roland Jeffords, the owner of Jefford's Well Drilling also testified that he had never sent

_____

[26] Ward was employed by Jefford's Well Drilling at the time of Gilbreath's murder.

76

Ward over to check on the Gilbreath's well. Ward claims that a handwritten note discovered in the Walker County Sheriff Department's files during post-conviction proceedings undermines the prosecution's contention at trial that Ward only visited the Gilbreath household in order to case the house for a future kidnaping.

The handwritten note in question reads as follows:

1-7-90   215.
Glenn & Angela Gilbreath
[Address]

had well drilled by Jeffords
had pump trouble – son came in
had to put 3 different pumps in.
No one even stopped by to check pump/ well w/o being called.

One day got off work early, Angela went to Nikia's to p.u.
    Elaina (baby)
Nikia babysitting at time for Elaina
Nikia mentioned expecting someone over to check well/pump
Angela works 1st shift

R1-6, Exh. 65 at 958. This note is substantially similar, however, to a typewritten report the defense received before trial. The typewritten report stated: "Angela stated that one day when she got off work early, she had gone to Nikia's to pick up their daughter, Elaina, who Nikia was babysitting for during that time period. She stated that Nikia had mentioned to her something about someone had stopped over at the Gilbreath residence to check the well and pump." Appellee's Brief at 63-64.

77

After comparing the handwritten note and the typewritten report and considering them in the context of the trial testimony of Billy Joe Gilbreath, Fred Dukes and Roland Jeffords, we confess to being unable to follow the chain of logic urged upon us by Ward. Ward contends that the handwritten note's use of the word "expecting" somehow indicates that Ward's second trip to the Gilbreath well was authorized. That argument ignores the remainder of the handwritten note and the other trial testimony directly relating to the matter. Indeed, the first portion of the handwritten note strongly suggests that someone other than an employee of Jefford's Well Drilling handled the Gilbreath's well issues: "had pump trouble – son came in . . . No one even stopped by to check pump/well w/o being called." In our view, given the strength of the evidence indicating that Ward was neither requested nor authorized to check on the Gilbreath well, the handwritten note is of limited significance. We do not hesitate in concluding that even had the handwritten note been disclosed to the defense, the result of the proceeding would not have been different. Consequently, because we find that the handwritten note in question is immaterial, Ward's <u>Brady</u> claim must fail.

3. Evidence that Someone Else Committed the Murder

As stated in Ward's initial brief to us, part of Ward's counsel's trial strategy was to raise doubts about Ward's guilt by presenting evidence implicating Jerry

Wayne Alexander.[27]  Ward contends that the state suppressed two pieces of

material evidence which later surfaced during post-conviction proceedings: (1) a

Polygraph Services Unit – Face Sheet ("Face Sheet"); and (2) handwritten

investigative notes from Walker County investigators Sam Haskett and Keith

Smith.  Ward maintains that these pieces of evidence demonstrate Alexander's

involvement in the Gilbreath murder and therefore undermine confidence in

Ward's guilty verdict.

The Face Sheet includes the following information:

> On August 24, 1989, during the early morning hours, an unoccuped [sic] dwelling house owned by Richard Puryear totally burned.  Even though no definite cause of the fire could be pinpointed, arson was suspected.  Jerry Alexander, a friend of Richard Puryear, had helped Puryear remodel the house and had spent the night in the house on several occasions during the past three months.  He reportedly last stayed in it on August 21, 1989.  Alexander is the prime suspect in the murder/rape of Nikia Gilbreath, who lived near the Puryear house.  He was interviewed by GBI agents on August 23, 1989, and was asked about the contents of the house.  During the interview with Alexander it was mentioned that the house would probably be searched.  It burned only a few hours after the interview.

R1-6, Exh. 65 at 965.  Next, we consider the investigative notes in question.  The

notes apparently memorialize a conversation between Haskett and Smith and

Lannie Cox, the State Fire Marshal who investigated the Puryear house fire and

ruled it an "undetermined fire."  R1-6, Exh. 31 at 2758.  The notes read as follows:

---

[27] Jerry Wayne Alexander was initially the prime suspect in the Gilbreath murder.

> Said Puryear told him victim's gown was in the house that burned that was the reason it burned.
>
> Machine went haywire when ask if anything of victim's was in the house.

R1-6, Exh. 65 at 911.

Ward asserts that the Face Sheet and the investigative notes, when viewed in tandem, demonstrate Alexander's complicity in Gilbreath's murder. We disagree. Ward's argument requires one inferential leap too many. First, we are to infer that Alexander was in possession of the victim's gown. Then we must conclude that Alexander secreted the gown in Puryear's house. Finally, we are urged to accept Alexander as the arsonist responsible for burning down Puryear's residence. We are to do this in the face of no evidence that a nightgown was missing from the Gilbreath household, no evidence that Alexander took the nightgown from the residence, and no evidence that Alexander set fire to the Puryear house – the official investigation into the fire concluding that the cause was "undetermined." Moreover, there is also the testimony of Jerry Michael Morris, Sr. to consider. Morris performed extensive investigative work for the defense and specifically was tasked with looking into Alexander's alleged complicity in the Gilbreath murder. His testimony is illuminating:

> Q: What type of evidence were you able to develop as far as Mr. Alexander being the person who committed this crime?

A [Morris]: Nothing really beyond what the State had already developed. In other words, say the interview with Mr. Alexander, I received basically the same information that had been furnished to law enforcement regarding his version of the time period that the homicide had occurred.

. . . .

Q: So would it be fair to say that you tracked down every lead that came to you?

A: That I had presented to me or that I developed, yes, sir.

R1-6, Exh. 61 at 51, 53. We conclude that neither the Face Sheet nor the handwritten investigative notes are material for the purposes of Ward's Brady claim. Even had they been available to the defense at trial, in our view the results of the proceeding would not have been different.

Finally, Ward urges us to find both the state habeas court and the district court's resolution of his Brady claims are contrary to the clearly established Supreme Court precedent of Kyles v. Whitley. Ward contends that neither court sufficiently examined the cumulative effect of the allegedly suppressed evidence, but only considered each piece independently. Even assuming that the state habeas court did not consider the evidence cumulatively for materiality purposes, we have

81

and conclude that the evidence, considered cumulatively, is not material.[28]

Consequently, we find no merit in Ward's "cumulative effect" argument.

G. <u>Unanimity Instruction</u>

Ward next challenges the trial court's unanimity instruction. He contends that the trial court's instruction conveyed to the jury the impression that they had to agree unanimously before considering any particular mitigating factor, and that the Georgia Supreme Court's failure to recognize this error constituted an

---

[28] We have explained our cumulative materiality analysis before.

> Cumulative analysis of the force and effect of the undisclosed pieces of favorable evidence matters because the sum of the parts almost invariably will be greater than any individual part. Whether the sum of the withheld evidence favorable to the defense will be enough to create a reasonable probability that the jury would have acquitted will depend on two factors. One factor is the net inculpatory weight of the evidence on both sides that actually was presented at trial. The other factor is the aggregate effect that the withheld evidence would have had if it had been disclosed. These two factors are brought to bear at the crucial second step of the materiality process, which begins with putting on the scales the evidence that was presented at trial – evidence favoring the prosecution on one side, that favoring the defense on the other. Then the force and effect of all of the undisclosed exculpatory evidence is added to the weight of the evidence on the defense side, while the force and effect of all the undisclosed impeachment evidence is subtracted from the weight of the evidence on the prosecution's side.

> Once the evidence on the scales is adjusted to take into account the combined force and effect of the undisclosed evidence favorable to the defense, the standard that is applied is not one of sufficiency of evidence to convict. It is instead whether what is left on both sides of the scale after adjusting for the withheld evidence creates a reasonable probability that a jury would acquit, and a reasonable probability is one sufficient to undermine our confidence in the guilty verdict.

<u>Smith v. Sec'y for the Dep't of Corr.</u>, 572 F.3d 1327, 1347 (11th Cir. Jun. 30, 2009).

82

unreasonable application of the Supreme Court's precedent in Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860 (1988).

Ward first raised his unanimity claim on direct appeal to the Georgia Supreme Court. See R1-6, Exh. 42 at 184. The Georgia Supreme Court addressed the claim and concluded that "[t]he trial court properly charged the necessity for unanimity in the jury's verdict." Ward, 417 S.E.2d at 138. The state habeas court found Ward's unanimity instruction claim barred, "as the Supreme Court of Georgia found on direct appeal that the trial court's charge . . . was proper." R1-6, Exh. 70 at 19. The district court agreed and concluded that the Georgia Supreme Court's finding was not contrary to, or an unreasonable application of, clearly established federal law, an that its conclusion was based on a reasonable determination of the facts.

In Mills v. Maryland, the Supreme Court held that it was error to instruct the jury that they were required to agree unanimously on the existence of mitigating factors before they could consider them. See Mills, 486 U.S. at 384, 108 S. Ct. at 1870. Our review of the trial court's instructions with regard to both the unanimity requirement and mitigating circumstances reveals no Mills violation. During the sentencing phase, the trial court first instructed the jury regarding its consideration of mitigating circumstances:

83

> Mitigating circumstances also differ from aggravating ones because you are not required to be convinced, beyond a reasonable doubt, that a mitigating circumstance exists, but you must take that circumstance into account as you deliberate this case. You must consider a mitigating circumstance if you believe that there is any evidence to support it.

R1-6, Exh. 39 at 5062. Later, after discussion of the verdict form, the court gave the following instruction on the unanimity requirement: "Whatever your verdict is in this case, it must be unanimous, just as during the guilt/innocence phase, and it must be agreed to by all twelve of you. . . ." Id. at 5065. We discern no error here. The trial court's unanimity instruction only pertained to the jury's verdict. The jury was never instructed that it had to agree unanimously on the existence of a particular mitigating circumstance before it could be considered. Ward's construction of the trial court's instructions strains credulity and we cannot credit it. Accordingly, we conclude that the district court did not err in finding that the Georgia Supreme Court's determination was neither contrary to nor an unreasonable application of Mills v. Maryland.

### III. CONCLUSION

Based on the foregoing, we conclude that the district court correctly denied habeas relief on those claims challenging the validity of Ward's convictions. We therefore AFFIRM Ward's convictions. We further conclude that the district court erred in denying habeas relief on Ward's claim of an improper bailiff-jury

84

communication during the penalty phase.  Accordingly, we REVERSE his death sentence and REMAND for a new sentencing phase hearing.  The district court's decision denying Ward's petition for a writ of habeas corpus is AFFIRMED in part and REVERSED in part.

**AFFIRMED in part and REVERSED in part.**

EDMONDSON, Circuit Judge, concurs in the result.